# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 05-934

RONALD FOX

VERSUS

JESSE A. ANDERSON AND TOWN OF KROTZ SPRINGS

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 02-C-2473-A
HONORABLE JAMES T. GENOVESE, DISTRICT JUDGE
HONORABLE ROBERT BRINKMAN, DISTRICT JUDGE, PRO TEMPORE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Glenn B. Gremillion, Judges.

**AFFIRMED AS AMENDED.**

Steven J. Bienvenu
Dauzat, Falgoust, Caviness, Bienvenu, L.L.P.
Post Office Box 1450
Opelousas, LA   70571
(337) 942-5811
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Town of Krotz Springs, Louisiana
    Jesse A. Anderson

Steven A. DeBosier
E. Eric Guirard & Associates
1075 Government Street
Baton Rouge, LA   70802
(225) 379-3333
COUNSEL FOR PLAINTIFF/APPELLEE:
    Ronald Fox

AMY, Judge.

The plaintiff alleges injury from an automobile accident in which the UPS truck he was driving was rear-ended by the patrol car of the defendant police officer. Following a bench trial, the trial court found both the plaintiff and the defendant police officer at fault in causing the accident. General damages, loss of earnings and earning capacity, and future medical expenses were awarded. The defendants appeal, questioning the finding of liability on their part, the apportionment of fault, the determination that the plaintiff was injured, and the quantum of damages awarded. The plaintiff answers the appeal, seeking an increase in the damages awarded. For the following reasons, we affirm as amended.

**Factual and Procedural Background**

The record indicates that on February 5, 2002, Ronald Fox, a UPS delivery driver, was traveling north in his delivery truck on Louisiana Highway 105 in Krotz Springs, Louisiana. At this time, Assistant Chief Jesse Anderson of the Krotz Springs Police Department was responding to information regarding a stalled vehicle on the Morganza Spillway Bridge, also known as the Four Mile Bridge. Officer Anderson testified that he had his emergency lights and siren on as he followed behind the UPS truck. He estimated that he was traveling approximately forty to fifty miles per hour because of what he perceived to be an emergency due to the stalled vehicle. Officer Anderson testified that as he approached the UPS truck, Mr. Fox did not pull over to the right to allow him to pass. Therefore, he checked the oncoming lane for vehicles and when he saw that the lane was clear, Officer Anderson attempted to pass the UPS truck at the intersection of Highway 105 and Highway 3178, also known as Florida Street.

Mr. Fox testified that he activated his left turn signal and attempted to make a left turn onto Florida Street. Mr. Fox explained that, in attempting to make the turn, he became aware of the police car and attempted to return to his previous lane of travel. While Mr. Fox admitted that he saw the emergency lights in the few seconds before impact, he denied hearing the police car's siren. Although Officer Anderson applied his brakes, the police car's front right side collided with the left rear of the UPS truck.

According to Mr. Fox, immediately after the impact, both he and Officer Anderson pulled their vehicles to the shoulder of the roadway. Officer Anderson notified the Louisiana State Police and Wanda Sue "Susie" Lacassin, Chief of the Krotz Springs Police Department. Both drivers denied being injured at the scene.

Trooper Michael Devillier of the Louisiana State Police arrived on the scene approximately thirty minutes after the accident occurred in order to investigate the accident. According to Trooper Devillier, he observed skid marks in the southbound lane of travel, caused by Officer Anderson's police car, that were twelve or thirteen feet long. Trooper Devillier concluded that the point of impact took place in the southbound lane based upon the skid marks, the damage to the vehicles, the interviews with the drivers, and the photographs taken.

Mr. Fox testified that after the accident, he completed the deliveries along his route. He explained that, when he went home that night, he was experiencing pain in his back, and the next morning his neck was stiff. Mr. Fox visited Dr. Alan Johnston, an orthopedic surgeon, two days after the accident. Dr. Johnston ultimately diagnosed Mr. Fox with a herniated lumbar disc. While under Dr. Johnston's care, Mr. Fox underwent several lumbar injections and participated in physical therapy.

Dr. Johnston subsequently referred Mr. Fox to Dr. Jorge Isaza, an orthopedic surgeon specializing in spine surgery.

Dr. Isaza explained that Mr. Fox's pre-existing spondylolisthesis was likely aggravated by the accident. He further diagnosed both a lumbar and a cervical disc herniation. He treated Mr. Fox conservatively with medications, injections, and a back brace. Although these conservative measures proved helpful to some degree, Mr. Fox continued to complain of back pain. Dr. Isaza explained that he recommended back surgery if Mr. Fox's condition did not improve.

Mr. Fox returned to UPS in May 2003, working at light duty for thirty days. According to Raymond Baker, the former manager at the UPS facility where Mr. Fox worked, UPS permits this type of temporary alternate work for only thirty days. Mr. Baker explained that if an employee could not go back to work as a driver, "[i]f there was a position that was available inside, he would have the right to bid on that job and he would be awarded that job allowing that he had enough seniority to be available for that job. But those jobs are very limited." Mr. Fox returned to UPS as a full-time delivery driver after the completion of his thirty days of light-duty work, but testified that by July 2003, he was in so much pain that he could not continue. He has not returned to work since that time.

Mr. Fox instituted this suit against Officer Anderson and the Town of Krotz Springs for damages resulting from this accident. Following a bench trial, the trial court found both Officer Anderson and Mr. Fox at fault in the accident. It found that Officer Anderson was traveling at a high rate of speed, passing in a no-passing zone, and doing so at an intersection. Officer Anderson was assessed with seventy-five percent of the fault. The trial court found Mr. Fox to be twenty-five percent at fault

3

for failing to maintain a proper lookout and failing to signal prior to turning. Mr. Fox was awarded the following damages:

a. Pain and suffering, disability, loss of enjoyment of life... $175,000.00

b. Loss of earnings and earning capacity.............................$150,000.00

c. Future Medical Expenses.....................................................$ 25,000.00

The defendants appeal this judgment and designate the following assignments as error:

1. The trial court erred in finding that the speed limit at the accident site was 25 mph.

2. The trial court erred in failing to apply the applicable standard of care for emergency vehicles, and the trial court erred in failing to consider the emergency defendant was responding to at the time of the accident.

3. The trial court erred in failing to find that the plaintiff was fully responsible for the accident in question after finding that the plaintiff failed to timely signal his left turn and to keep a proper lookout.

4. The trial court erred in its allocation of percentages of comparative fault.

5. The trial court erred in finding that the plaintiff suffered a back injury with disc involvement as a result of the accident sued upon.

6. The trial court erred in awarding $175,000.00 in general damages for soft tissue injuries, and the trial court erred in awarding $150,000.00 in loss of earnings and earning capacity.

The plaintiff answered this appeal, asserting the following assignments of error:

1. The trial court erred in finding plaintiff 25% at fault in this accident.

2. The trial court erred in only awarding $175,000 in general damages when evidence of pain and suffering demonstrated a much higher award, and, failed to consider the full extent of plaintiff's future lost wages and loss of earning capacity.

4

3.     The trial court erred in failing to award plaintiff's future lost wages.

**Discussion**

*Fault*

Each party questions the trial court's determination that it was at fault. The defendants question two aspects of the trial court's finding of fault on the part of Officer Anderson and the Town of Krotz Springs. First, they assert that the trial court erred in concluding that Officer Anderson was traveling fifty to fifty-five miles per hour in a twenty-five mile per hour speed zone. Rather, the defendants point to testimony from Police Chief Lacassin and Officer Anderson that the section of highway where the accident occurred is enforced as a fifty-five mile per hour speed zone. They assert that signs advising of the increased speed in this area had not been returned following road work in the area. Further, the defendants contend that the trial court failed to apply the appropriate standard of care for emergency vehicles. They reference La.R.S. 32:24, a provision relating to the applicability of traffic regulations to emergency vehicles.

In his answer to the appeal, Mr. Fox questions the imposition of fault on his part. Mr. Fox points to his testimony that he was maintaining a lookout through the use of his side mirrors and argues that this testimony is supported by the fact that he was able to attempt an evasive maneuver prior to impact. He asserts that he was able to do so despite the fact that Officer Anderson closed the distance between them at a high rate of speed.

In reasons for ruling, the trial court explained as follows with regard to fault:

Considering the evidence presented, the Court makes the following findings of fact:

5

a. The speed limit at the accident site (for motorists traveling north on La. Hwy. 105) was 25 mph;

b. The defendant, just before the accident, was traveling between 50-55 mph (in town) in a 25 mph zone while passing the plaintiff at an intersection in a "no passing" zone;

c. The plaintiff failed to timely signal his left turn and keep a proper lookout;

d. The road was wet; and

e. Defendant was responding to a "stalled vehicle" on the "4-mile bridge" in a neighboring parish outside his jurisdiction.

According to his own testimony, the defendant saw plaintiff's vehicle on La. Hwy. 105 before he entered said highway. He knew the defendant [sic] prior to the accident and knew he drove a UPS truck. Being a police officer, he knew the accident area. He was aware of the road conditions. He was traveling more than double the speed limit, in town, on a wet road, and passing a vehicle at an intersection in a no passing zone. He knew or should have known that he was traveling at a high rate of speed and passing a vehicle in a no-passing zone at an intersection and that said vehicle, a UPS truck, makes frequent stops and turns for deliveries. Defendant knew or should have known that at that intersection the only maneuver that the plaintiff could make to cause an accident while he was passing said vehicle would be a left turn, and he failed to anticipate that or take the necessary precautionary measures while in an "alleged" emergency situation to avoid an accident. Because defendant saw and was following the plaintiff well in advance of the accident, and because the plaintiff did not see the defendant until just before the accident, the defendant was more in control of the situation and yet chose to speed and pass in a no-passing zone at an intersection thereby proximately causing the accident in question. The defendant [sic], on the other hand, failed to timely and properly signal and keep a proper lookout. Had he done what he said he did in the operation of his vehicle, then he would have seen/heard the plaintiff [sic] approaching the intersection and taken the proper and legal action in responding to an alleged emergency vehicle situation. The facts indicate that the accident actually happened when both drivers, just before the accident, attempted evasive action.

An appellate court will not set aside a trial court's findings of fact absent manifest error or unless the findings are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Furthermore, "where there is conflict in the testimony, reasonable

6

evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id.* at 844. *See also Cross v. Timber Trails Apartments*, 04-1623 (La.App. 3 Cir. 4/6/05), 899 So.2d 853.

Having reviewed the record, we find no manifest error in the trial court's determination that both parties were at fault in causing the accident. The record demonstrates that Officer Anderson chose to pass vehicles in a no-passing zone, doing so at a high rate of speed[1] and in an area with a number of driveways and an intersection. He did so with wet road conditions. Furthermore, the trial court's reasons indicate that it considered the nature of the "emergency" that Officer Anderson was responding to in considering the reasonableness of his actions. While recognizing the emergency vehicle provision of La.R.S. 32:24,[2] we find that it was

---

[1] Given the presence of other factors supporting the determination that Office Anderson was at fault in the accident, we do not address the specific finding as to the area's speed limit.

[2] Louisiana Revised Statutes 32:24 provides:

A.     The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated:

B.     The driver of an authorized emergency vehicle may:

(1)     Park or stand, irrespective of the provisions of this Chapter;

(2)     Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operations;

(3)     Exceed the maximum speed limits so long as he does not endanger life or property;

(4)     Disregard regulations governing the direction of movement or turning in specified directions.

C.     The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

not error for the trial court to consider that Officer Anderson was responding to a stalled vehicle on a bridge outside of his jurisdiction. In fact, the scene he was responding to was not only outside of the Town of Krotz Springs, but was located in another parish. Furthermore, La.R.S. 32:24(D) requires that even those qualified vehicles responding to an emergency "drive with due regard for the safety of all persons . . . ." Given the circumstances of this case, the trial court was permitted to conclude that Officer Anderson did not do so.

With regard to Mr. Fox, the trial court was free to reject his assertion that he engaged his turn signal prior to turning left. Recall that Officer Anderson denied that the turn signal was in use. Given this discrepancy between the accounts, the trial court was entitled to make the necessary credibility determinations and conclude either that Mr. Fox failed to signal his intention to turn or did not do so in a timely fashion. Even with the short distance and speeds involved, the trial court was also free to conclude that had Mr. Fox kept an appropriate lookout, he would have become aware of Officer Anderson's presence in sufficient time so as to stop his left turn.

For these reasons, the record supports the trial court's determinations that both parties were at fault. The record further supports the decision to apportion seventy-five percent of the fault to Officer Anderson and twenty-five percent of the fault to Mr. Fox.

*Presence of Injury*

The defendants also argue that the trial court erred in finding that the plaintiff suffered a back injury with disc involvement as a result of the accident. They point

---

D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

8

to previous back complaints of Mr. Fox and refer to the findings of Dr. Joe Morgan, their choice of examining physician. Dr. Morgan opined that Mr. Fox's condition was not related to the accident, but was strictly degenerative in nature.

In finding that the accident caused injury to Mr. Fox, the trial court explained:

As far as plaintiff's back is concerned, this constitutes an aggravation of a pre-existing condition. Most of plaintiff's medical treatment, as a result of this accident, was related to his back. Though he alleges a neck problem as a result of a cervical disc herniation, there was minimal treatment specifically therefor. The medical evidence indicates that the plaintiff's back condition reveals spondylolysis with recorded degree of spondylolisthesis at L5-S1, disc bulge with central disc herniation and articular facet degeneration at L4-5, along with disc bulges at C3-4 and C5-6, all evidenced by diagnostic testing.

As regards plaintiff's back condition, unquestionably, plaintiff suffered a back injury with disc involvement as a result of his 2/5/02 accident. Unquestionably, plaintiff's back injury constituted an aggravation of a pre-existing condition.

Again, even if reasonable finders of fact might have concluded differently, the above result is supported by the record. While the defendants' physician concluded that Mr. Fox's injuries were not related to the accident, the trial court was able to reject this testimony. Furthermore, the trial court afforded more weight to Mr. Fox's treating physician, Dr. Isaza. Based on his review of an MRI, Dr. Isaza testified that Mr. Fox suffered a herniation at the cervical level as well as a lumbar herniation. Mr. Fox's back complaints were the focus of Dr. Isaza's treatment. While Dr. Isaza explained that Mr. Fox's spondylolisthesis predated the accident and was a possible cause of Mr. Fox's pre-accident back strains, he stated that the accident aggravated the condition. He testified that, given the history provided both by Mr. Fox and his medical records, the herniation was more likely than not caused by the accident. Dr. Isaza specifically rejected Dr. Morgan's determination that the herniation was

9

degenerative in nature. He also denied that Mr. Fox demonstrated behavior consistent with a patient who is exaggerating injuries so as to prevent returning to work.

With the above evidence supplied by the record, the trial court's conclusion that the plaintiff suffered a back injury with disc involvement due to the accident is not manifestly erroneous.

This assignment is without merit.

*Loss of Earnings and Earning Capacity*

Both parties question the $150,000.00 award made for "loss of earnings and earning capacity." The defendants contend that the award is unwarranted, alleging that the plaintiff's inability to work was based on his own decision not to do so. They point to Dr. Isaza's release for Mr. Fox to return to work during the summer of 2003, when he briefly returned to UPS. The plaintiff argues that the trial court failed to consider the full extent of his future loss of earnings and loss of earning capacity in its award.

The trial court's reasons for ruling do not distinguish between past lost wages, future loss of earnings, and future earning capacity. Before awarding a lump sum figure of $150,000.00 for "loss of earnings and earning capacity," the court explained generally that:

> As regards plaintiff's back condition, unquestionably, plaintiff suffered a back injury with disc involvement as a result of his 2/5/02 accident. Unquestionably, plaintiff's back injury constituted an aggravation of a pre-existing condition. However, in assessing damages, there are other factors to consider. Approximately six (6) weeks post-accident, the surveillance tape shows the plaintiff uninhibitedly participating in a bass fishing tournament, up and down and around and through, with unbridled ease and performance, and without any real or perceived back pain or impediment. Additionally, the plaintiff returned to work some sixteen (16) months post accident for a couple of months. What is equally perplexing is plaintiff's indifference towards treatment (surgery) in hopes of improving his back

10

condition. He is over 2-1/2 years post accident and is still receiving, at best, conservative treatment for his back and none for his neck. This constitutes an unoperated-on lumbar disc case. The Court cannot justify a $100,000 award for the cost of future back surgery and has gone over 2-1/2 years post accident without having it.[3] Evidently, plaintiff intends to maintain the status quo from a medical treatment standpoint despite his own doctor's recommendation of surgery if he did not get better. It's been over two-and-a-half years and he says he's no better and no surgery is planned. Therefore, he has reached a medical plateau. This also factors into plaintiff's claim for loss of earnings.

Insofar as the trial court's award includes damages for past lost wages, this type of award is not one in which the trial court is afforded "much discretion." *Thibodeaux v. Bernard*, 00-72 (La.App. 3 Cir. 11/2/00), 772 So.2d 897. Rather, this type of award is susceptible of mathematical calculation from the proof offered at trial. *Id.* However, insofar as the lump sum award includes damages for future loss of earnings and loss of earning capacity, it is reviewed on appeal for manifest error. *Fruge v. Hebert Oilfield Const., Inc.*, 03-349 (La.App. 3 Cir. 10/1/03), 856 So.2d 100, *writ denied,* 03-2997 (La. 1/30/04), 865 So.2d 77.

First, recall that we concluded that the trial court's determination as to causation is supported by the record and must be sustained, even in the event this court might have differed in its evaluations as to weight and credibility. *See Rosell*, 549 So.2d 840. Furthermore, by awarding damages for "loss of earnings and earning capacity," the trial court obviously concluded that the plaintiff could not return to work to some degree. Again, due to relevant medical evidence and the fact that the plaintiff has been unsuccessful in his attempt to return to UPS, the trial court's determination as to his inability to work to some degree is supported by the record.

---

[3] Mr. Fox does not appeal the trial court's determination that he failed to prove entitlement to costs of the surgery.

11

Although the defendants contend that Mr. Fox is simply choosing not to return to work and that this choice is demonstrated by the fact that he attempted to return to work during a two-month period, Dr. Isaza's deposition reveals that he supported Mr. Fox in his attempt to return to work. However, Dr. Isaza also confirmed that Mr. Fox's inability to continue in that position was consistent with what he felt would happen. Dr. Isaza further explained that Mr. Fox cannot return to his position and will not be able to do so in the future due to pain. This evidence, when considered in the context of the record and when joined with Mr. Fox's testimony, supports the trial court's determination that the accident and resulting injury caused a loss of earnings and earning capacity.

Based on the affirmation of the above finding as to inability to work, the evidence in the record reveals that the trial court's award of $150,000.00 for that loss is manifestly erroneous. Both parties submitted vocational rehabilitation and economists reports regarding Mr. Fox's earnings losses. Although we must consider these reports on a cold record, all reveal the inadequacy of the $150,000,00 given the trial court's preliminary findings. In particular, we reference the report of the defendants' economist, Dr. Kenneth Boudreaux, doing so as his report includes more detail and explanation than does the two-page report of the plaintiff's economist. Additionally, one of his reports incorporates Mr. Fox's work-life expectancy at UPS as testified to by Dr. Isaza. The work-life factor will be discussed below.

Dr. Boudreaux calculated Mr. Fox's past loss of earnings using an average of Mr. Fox's earnings from 1997 to 2001. His calculations also accounted for the two month period in 2003, when Mr. Fox attempted to return to work. Given this average wage base of $55,817.80, Dr. Boudreaux calculated Mr. Fox's income from the date

12

of the accident through the date of trial to be $131,171.83.  As there is no real question in the record as to the loss of these earnings, again due to the record's support of the trial court's underlying findings, the record reveals error in an award that fails to account for this loss.

With regard to future loss of earnings and earning capacity, Dr. Isaza indicated that Mr. Fox's back condition will prevent his return to UPS as a delivery person insofar as the position requires regular lifting of seventy-five pounds.  Although the trial court commented on Mr. Fox's lack of interest in undergoing surgery to correct the problem, Dr. Isaza explained that if even if Mr. Fox has the recommended surgery, he will continue to have certain lifting limitations.  Thus, the record establishes that Mr. Fox cannot return to his former position.  However, it also establishes that Mr. Fox can return to work in some capacity.

The plaintiff's "Vocational Evaluation," completed in February 2003, anticipated that "pending improvement in medical status and the acquisition of additional vocational skills and formal education, Mr. Fox can regain access to the labor market."  The defendants' "Vocational Rehabilitation Report," completed immediately prior to trial, reflects a determination that a return to light physical demand level is possible.  The Licensed Rehabilitation Consultant completing the report surveyed a number of potential positions.

Dr. Boudreaux completed a report, again immediately prior to trial, projecting earning capacity assuming a return to work at some of the wages identified by the rehabilitation consultant, including $17,700.00 as the median income for a retail sales position and $23,878.40 for a truck driver performing "light" duty.  The ability to perform work at the $17,700.00 rate appears to be better supported by the record

13

insofar as Mr. Fox's ability to function in the more remunerative truck driver position appears speculative. Only a general description of any lifting responsibilities associated with such position was provided in the report. It is also significant to note that, in performing his calculations as to future earning capacity based on these wage rates, Dr. Boudreaux assumed that, notwithstanding the accident, Mr. Fox would have remained in his position with UPS only until the age of fifty-five. The inclusion of this factor is consistent with Dr. Isaza's deposition, wherein he commented generally on the nature of the UPS position and the likelihood that Mr. Fox's pre-existing back strain would have become a factor in continued employment. Given these factors, and taking into account the annual income growth and discount rates applied in Dr. Boudreaux's report, the evidence indicates that Mr. Fox's loss of future earning capacity is $158,949.07.

In light of the record, the trial court's award is manifestly erroneous insofar as its "loss of earnings and earning capacity" award was insufficient to compensate Mr. Fox for $131,171.83 for past lost wages/earnings and $158,949.07 for loss of future earning capacity. Accordingly, we amend the judgment to reflect an award of $290,120.90 for loss of earnings and earning capacity.

*General Damages*

Finally, we address the parties' concerns regarding the $175,000.00 award for general damages. The defendants contend that the award was excessive as there was "no real change" in Mr. Fox's condition before and after the accident. The defendants also advance certain testimony for the proposition that Mr. Fox made the choice not to return to work rather than his condition preventing him from doing so.

In turn, Mr. Fox argues that evidence of pain and suffering demonstrated entitlement to a much larger award.

The standard of review applicable to general damages was addressed recently in *Basco v. Liberty Mut. Ins. Co.*, 05-0143, p. 9 (La.App. 3 Cir. 8/17/05), 909 So.2d 660, 666 (citations omitted), wherein a panel of this court stated:

> [I]n reviewing an award of general damages, the role of an appellate court is to review the exercise of discretion by the trier of fact . . . . It is only when the trier of fact has abused its much discretion that the appellate court may disturb the award, but then only to the extent of lowering it to the highest point or raising it to the lowest point which was reasonably within the discretion of the trier of fact.

The record indicates that the $175,000.00 general damages award was within the trial court's discretion. The trial court concluded that Mr. Fox suffered, at the least, an aggravation of a pre-existing condition. Mr. Fox underwent physical therapy and a number of lumbar injections in treatment of his condition. He explained at trial that he continues to experience back pain which he tries to control with medication and rest. He stated that: "Most anything I do, I do end up causing myself more pain." Mr. Fox testified as to his inability to plan for and schedule activities due to pain, as well as his difficulty in playing with his grandchildren. He explained that these changes in his lifestyle have been very depressing. He testified at length as to his inability to fish as often as he did prior to the accident. Mrs. Fox corroborated her husband's testimony regarding his inability to play with his grandchildren and their family's inability to fish as regularly as they once had.

The accident also impacted Mr. Fox's ability to continue in his position with UPS. As explained above, Dr. Isaza testified as to the difficulties Mr. Fox will have performing his job with UPS insofar as he must regularly lift seventy-five pounds. When asked how he felt when told that he would not be returning to his job, Mr. Fox

15

stated: "Well, that was very depressing. I love my job and I'm very good at it." He further explained: "I love my job. It was made for me. I'm a very hyper person, it fits me just perfect. It's everything I ever wanted, and it's been really, really good to me." He explained that due to his decrease in income, his wife had to begin working.

Based on this evidence regarding Mr. Fox's pain and suffering, his disability, and loss of enjoyment of life, we conclude that the record supports the award of $175,000.00 in general damages. As we have found this award to be within the trial court's discretion, we make no comparison to awards in cases involving similar injuries. *See Cone v. Nat'l Emergency Servs, Inc.*, 99-0934 (La. 10/29/99), 747 So.2d 1085.

The parties' arguments in this regard lack merit.

## DECREE

For the foregoing reasons, we amend the judgment to reflect an award of $290,120.90 for loss of earnings and earning capacity. Adjusted to reflect the twenty-five percent apportionment of fault to the plaintiff, Ronald Fox, the award for loss of earnings and earning capacity is $217,590.67. In all other respects, the judgment of the trial court is affirmed. All costs of this proceeding are assessed equally between the plaintiff, Ronald Fox, and the defendants, Jesse A. Anderson and the Town of Krotz Springs.

**AFFIRMED AS AMENDED.**